**No. 26-10794**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**STATE OF TEXAS,**

**Plaintiff–Appellee,**

**v.**

**UNITED STATES OF AMERICA; TODD WALLACE BLANCHE, U.S. Attorney General; and SIRCE OWEN, Acting Director of Executive Office for Immigration Review,**

**Defendants–Appellees,**

**v.**

**CITY OF BALTIMORE, MD; CITY OF COLUMBUS, OH; CITY OF NEW HAVEN, CT; and CENTRO LEGAL DE LA RAZA,**

**Movants–Appellants.**

---

# DEFENDANTS–APPELLEES' OPPOSITION TO MOVANTS–APPELLANTS' MOTION FOR A STAY PENDING APPEAL AND SUMMARY REVERSAL

---

STANLEY E. WOODWARD, JR.
Associate Attorney General

HENRIQUE CARNEIRO
Counsel to the Associate Attorney General

ANNA L. EDWARDS
Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue
Washington, D.C. 20530
anna.edwards@usdoj.gov
Counsel for Defendants–Appellees

**TABLE OF CONTENTS**


INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................2

ARGUMENT ........................................................................................3

I. Appellants have not established a strong showing of a likelihood of success on the merits. ........................................................................4

A. Appellants are not entitled to intervention as of right. ...............4

B. Appellants' challenges to the district court's judgment are beside the point and in any event are meritless. .......................12

II. The other stay factors strongly favor the government. .......................17

CONCLUSION ........................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 19

*Airlines for Am. v. Dep't of Transp.*,
166 F.4th 487 (5th Cir. 2026) .......... 15

*Aristy-Rosa v. Att'y Gen.*,
2026 WL 2363039 (3d Cir. Aug. 14, 2026) .......... 19

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 18

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
19 F.3d 241 (5th Cir. 1994) .......... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 8

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) .......... 12

*DeOtte v. Nevada*,
20 F.4th 1055 (5th Cir. 2021) .......... 4

*Edwards v. City of Houston*,
78 F.3d 983 (5th Cir. 1996) .......... 12

*El Paso Cnty., Texas v. Trump*,
982 F.3d 332 (5th Cir. 2020) .......... 5

*Hernandez-Serrano v. Barr*,
981 F.3d 459 (6th Cir. 2020) .......... 17

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 13, 14

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .......... 18

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 4

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 47 (1971) .......... 13

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 3, 19

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 19

*Pool v. City of Houston*,
87 F.4th 733 (5th Cir. 2023) .......... 14

*State of Florida v. Mellon*,
273 U.S. 12 (1927) .......... 18, 20

*Texas v. U.S. Dep't of Interior*,
2026 WL 2672757 (5th Cir. Sept. 11, 2026) .......... 4

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025) .......... 8, 9

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) .......... 19

*United Food & Comm. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) .......... 20

*United States v. Scroggins*,
599 F.3d 433 (5th Cir. 2010) .......... 11

*United States v. Texas*,
173 F.4th 659 (5th Cir. 2026) .......... 11, 18

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) .......... 12

*United States v. Texas*,
599 U.S. 670 (2023) .......... 8

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 13, 14

*Va. House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) .......... 4

**Statutes**

8 U.S.C. § 1101 .......... 16

8 U.S.C. § 1103(g)(2) .......... 16

8 U.S.C. § 1229a .......... 1, 16

8 U.S.C. § 1551 .......... 16

**Other Authorities**

EOIR Policy Memorandum 25-29, Cancellation of Director's Memorandum
22-01 (Apr. 18, 2025), https://perma.cc/U2TH-6MFK .......... 2, 14

EOIR, *Adjudication Statistics: Amnesty Cases*
(July 31, 2025), https://perma.cc/3MFH-JSYW .......... 1, 5

EOIR, *Adjudication Statistics: EOIR Amnesty Cases by State (or Location)*
(July 24, 2026), https://perma.cc/RJ35-JYHU .......... 9

*Matter of Quintero*,
18 I&N Dec. 348 (BIA 1982) .......... 16

U.S. Citizenship & Immigr. Servs., Policy Manual
(Sept. 18, 2026), https://perma.cc/TA7V-VUMA .......... 8

**Rules**

Fed. R. Civ. P. 24(a) .......... 3, 12

**Regulations**

8 C.F.R. § 1003.18(c) .......... 7

8 C.F.R. § 1003.29 .......... 7

8 C.F.R. § 1239.2(c) .......... 7

8 C.F.R. § 239.2(a)(7) ........................................................................................7

Efficient Case and Docket Management in Immigration Proceedings,
89 Fed. Reg. 46,742 (May 29, 2024) ...............................................................1, 2

# INTRODUCTION

Congress directs immigration judges to "decide whether an alien is removable from the United States" at the conclusion of a removal proceeding. 8 U.S.C. § 1229a(c)(1)(A). No provision of the Immigration and Nationality Act ("INA") gives immigration judges authority to decline to do so. The proposed intervenor Appellants believe the Department of Justice should allow immigration judges to abdicate this statutorily mandated duty by "administratively" closing cases. But allowing immigration judges to exercise discretion by pausing a case indefinitely—often for decades, if not forever—would subvert Congress's directive.[1] The district court correctly concluded that this practice exceeds statutory authority; correctly vacated the 2024 rule, titled "Efficient Case and Docket Management in Immigration Proceedings," 89 Fed. Reg. 46,742 (May 29, 2024) ("Rule"), that codified the practice; and correctly enjoined the Department from administering the Rule or promulgating future rules allowing for administrative closure. *See* Appellants' Add.049–50.

---

[1] "As of July 31, 2025, EOIR estimated that: 'For all inactive pending cases, the average length of time a case has been administratively closed is 6,120 days (approximately 16½ years) and the median length of time is 4,242 days (approximately 11½ years) . . . At the Board of Immigration Appeals, the average length of time a case has been administratively closed is 10,647 days (approximately 29 years) and the median length of time is 12,588 days (approximately 34 years).'" Compl. ¶ 68, Add.018 (quoting EOIR, *Adjudication Statistics: Amnesty Cases* 2 (July 31, 2025), https://perma.cc/3MFH-JSYW).

Appellants' request to stay that decision should be denied. First, Appellants fail to establish a likelihood of success on the merits. They do not have standing to intervene as defendants, and thus as nonparties, they cannot appeal the consent judgment. But even if they could, Appellants are wrong on the merits and thus cannot make a strong showing of a likelihood of success. Second, the balance of harms weighs in the Department's favor because Appellants' claimed injuries are speculative and seek to thwart the Executive's role over immigration matters.

## BACKGROUND

On May 29, 2024, the Department issued the Rule, which broadly allowed immigration judges within the Department's Executive Office for Immigration Review ("EOIR") to administratively close immigration removal proceedings in their unbounded discretion. *See* 89 Fed. Reg. at 46,789, 46,792. On April 18, 2025, EOIR's Director issued a Policy Memorandum ("PM") stating that "EOIR cannot—and will not—defend [the Rule] in good faith if challenged in litigation." EOIR Policy Memorandum 25-29, Cancellation of Director's Memorandum 22-01 at 4 n.2 (Apr. 18, 2025), https://perma.cc/U2TH-6MFK ("PM 25-29").

On June 22, 2026, the State of Texas filed a complaint challenging the Rule on various grounds. *See* Add.001–43. Texas and the Department jointly moved for entry of a consent judgment, which the district court granted, *see* Add.044–47, 049–50. On August 7, 2026, Appellants moved to intervene as defendants under Fed.

R. Civ. P. 24(a) to appeal the court's judgment. *See* Add.086. The district court denied their motion, finding that Appellants did not establish standing. Add.086–94. Appellants then unsuccessfully moved for an emergency stay pending appeal. *See* Add.095.

Appellants ask this Court to stay the consent judgment pending their appeal of the denial of their motion to intervene and, to the extent necessary, to summarily reverse the district court's denial of intervention to permit the Court to stay the judgment. *See generally* ECF No. 23-1 ("Mot.").

## ARGUMENT

Courts addressing a motion for a stay pending appeal consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted). The final two "factors merge when the Government is the opposing party." *Id.* at 435. Appellants are not entitled to a stay pending appeal. Appellants have not made a strong showing of a likelihood of prevailing on the merits of their intervention motion or their challenge to the district court's judgment. In any event, the other *Nken* factors also weigh against relief.

## I. Appellants have not established a strong showing of a likelihood of success on the merits.

Appellants fail to show that they are entitled to intervene because they lack standing and have no viable challenge to the judgment in this case even assuming they could establish standing or appellate jurisdiction.

### A. Appellants are not entitled to intervention as of right.

"To appeal a decision that the primary party [*i.e.*, the Government] does not challenge, an intervenor must independently demonstrate standing." *Texas v. U.S. Dep't of Interior*, 2026 WL 2672757, at *10 (5th Cir. Sept. 11, 2026) (quoting *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019)). Thus, to appeal, "an intervenor must demonstrate an injury from the district court's judgment to establish appellate standing," *DeOtte v. Nevada*, 20 F.4th 1055, 1070 (5th Cir. 2021), by showing (1) a concrete and particularized injury that is (2) fairly traceable to the vacatur of the Rule and (3) is likely to be redressed by a favorable decision, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Appellants did not make that showing, and their arguments to the contrary, *see* Mot. 9–14, fail. This Court should deny their motion on this ground alone.

Appellants assert four general theories of harm to establish standing: (1) the judgment will extinguish the Cities' identifiable revenue streams, Mot. 9–11; (2) the judgment will affect the Cities' law enforcement operations by removing an incentive for aliens to come forward to report crimes, Mot. 11–13; (3) Centro Legal

will be forced to represent aliens for free when their cases are recalendared or reopened, Mot. 13–14; and (4) Centro Legal relied on the Rule when it agreed to dismiss litigation challenging a prior rule, Mot. 14.

**1.** The Cities' predicted losses in tax revenue, Mot. 9–11, are not sufficiently traceable to the judgment, nor are such losses concrete, actual, or imminent. The Cities are concerned about cases being recalendared and aliens being removed after their cases are adjudicated, which they believe will decrease their taxpayer base because some aliens currently have work authorization and work and pay taxes in the Cities. Mot. 9–11. But the Department has been recalendaring cases since before the judgment existed.[2] The Cities cannot show that any individual case was recalendared as a result of the judgment, as opposed to other changes in Administration policy.

Moreover, the alleged harm is hypothetical and relies on speculation as to the actions of multiple Federal officials. As this Court recently held, a municipality's "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020). Appellants respond that they do not allege loss of *general* tax revenue but instead have identified specific revenue streams the judgment will extinguish—city income

---

[2] *See* EOIR, *Adjudication Statistics: Amnesty Cases* 2 (July 31, 2025), https://perma.cc/3MFH-JSYW (showing decreases in the number of administratively closed cases since the beginning of fiscal year 2025).

taxes currently paid by "affected individuals" whose immigration proceedings were paused and who have been able to "work legally while their [U visa] applications are pending." Mot. 9–10. Such individuals "now face reopened removal cases" and "[e]ach worker who is ultimately removed is a specific taxpayer whose payments the Cities lose." Mot. 10. But the Cities' declarations advance nothing more than general allegations that aliens in the United States can obtain work permits, that U visa applicants may obtain work permits, and that such individuals pay local income taxes. Add.052–53, 081–82. Critically, the Cities' declarations do not allege that any aliens who reside within the Cities are U visa applicants with work permits who work and pay local income taxes to those cities and whose removal proceedings are administratively closed. *See* Add.051–53 (Columbus, OH), 76–79 (New Haven, CT), 80–85 (Baltimore, MD). Indeed, while Columbus's declaration indicates that there have been 35 U visa certifications signed off on by the city since 2023, nothing indicates those 35 people have work permits, work, pay taxes to the city, or have administratively closed removal proceedings. *See* Add.074. And Baltimore's declaration indicates that there are "more than 60 residents eligible for a U visa" and hypothesizes that those residents' immigration cases—whose defense the city funded—"will now return to active dockets," but the declaration does not identify specific cases or any aliens who have work authorization or pay taxes to the city.

Add.084. The Cities have failed to point to even one of their alien taxpayers who will be affected by the judgment.

Moreover, Appellants' arguments about U visa applicants are irrelevant. Even if U visa applicants in their cities who work and pay taxes have their removal proceedings recalendared, they have not shown that removal before adjudication of their application is likely. Recalendaring does not mean that the aliens will lose work authorization or be removed from the United States. The Rule did not require that U visa applicants' cases be administratively closed and never prohibited any cases that were administratively closed from being recalendared. *See generally* 8 C.F.R. § 1003.18(c). And nothing in the judgment requires that any recalendared proceedings go forward as opposed to being continued pending U visa adjudication, *see* 8 C.F.R. § 1003.29 (allowing for continuances for good cause shown), or dismissed by the Department of Homeland Security ("DHS"), *see id.* §§ 1239.2(c), 239.2(a)(7) (allowing DHS to move to dismiss removal proceedings where "[c]ircumstances of the case have changed . . . to such an extent that continuation is no longer in the best interest of the government"). Even if a removal order is entered, U visa applicants may still receive work authorization and remain in the United States while awaiting adjudication of their visa applications under DHS's "bona fide

determination" process.[3] Accordingly, the Cities' arguments with respect to the loss of tax revenue from U visa applicants whose cases will be recalendared (or reopened) are "too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also Texas v. United States*, 126 F.4th 392, 410 (5th Cir. 2025) (explaining that when a State claims "a federal law has produced only . . . indirect effects" on "state revenues," its "claim for standing can become more attenuated" (quoting *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) ("*Immigration Priorities*"))).

The Cities' arguments also fail to the extent they are concerned about other aliens with or without work authorization who currently pay local income taxes and whose removal proceedings have been administratively closed. Aliens whose cases are recalendared will have the opportunity to make their case that they should not receive removal orders. Some may be granted relief or protection from removal, in which case they will be able to work and continue paying those local income taxes. With respect to aliens who are unable to show entitlement to remain in the United States and are not granted some form of relief or protection from removal, the Cities cannot claim a cognizable interest in the continued presence of aliens who are not

[3] *See* U.S. Citizenship & Immigr. Servs., Policy Manual, Chap. 6 (Sept. 18, 2026), https://perma.cc/TA7V-VUMA (explaining the process for "bona fide determinations," through which DHS grants deferred action (which delays removal) and employment authorization to U visa applicants).

legally authorized to be present in the United States. Finding that the Cities have standing under such a theory would amount to a determination that local governments have a cognizable interest in EOIR not carrying out the duties Congress assigned to it by statute.

These conclusions do not entail subjecting the Cities to a standard different from the one applied to Texas. *Contra* Mot. 10–11. Texas alleged specific harms relating to legally compelled healthcare, education, and correctional expenditures. *See* Compl. ¶¶ 70–99. And EOIR's data shows that as of July 24, 2026, there were 19,293 cases administratively closed in Texas. *See* EOIR, *Adjudication Statistics: EOIR Amnesty Cases by State (or Location)* (July 24, 2026), https://perma.cc/RJ35-JYHU. Expenditures of the kind Texas asserts can be reasonably expected to flow from the presence of almost 20,000 illegal aliens in the State of Texas. And Texas and other States have in the past established standing on related bases. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 408–11 (5th Cir. 2025) ("*Texas DACA*") (concluding that Texas had standing to challenge the Deferred Action for Childhood Arrivals program based on mandatory expenditures and that such a challenge was not precluded by *Immigration Priorities*). The Cities, on the other hand, string together a series of suppositions to claim they will lose tax revenues but do not allege facts sufficient to get there—i.e., that there is even one U visa applicant working and paying taxes in an Appellant City whose removal proceedings have been

administratively closed and who will stop paying taxes because his removal proceedings will be recalendared, he will be ordered removed, DHS will decline to grant him deferred action, DHS will terminate his work permit, and he will at some point in the future be removed from the United States.

**2.** The Cities' concerns about crime victims being unwilling to come forward are speculative and also fail to establish standing. *See* Mot. 11–13. The concerns are also demonstrably unwarranted. As discussed above, administrative closure is not the primary bulwark against removal for U visa applicants—that would be DHS's prosecutorial discretion in the form of deferred action and dismissal. And even if the Rule were in place, it would not prevent immigration judges from recalendaring such applicants' removal proceedings and seeing them to a final conclusion. Finally, Appellants cite nothing in their supporting documents establishing that administrative closure is at all considered by aliens when deciding to come forward and report crimes. *See* Add.074, 081–82 (discussing U visas generally). Accordingly, Appellants' argument is mere conjecture.

**3.** The claimed pocketbook injuries Appellant Centro Legal, expects to suffer, Mot. 13–14, likewise fail to support standing. "A legal-services organization cannot have Article III standing merely because a new law or regulation requires it to . . . adjust resources in response, or to increase the degree or scope of legal representation for its current or prospective clients who may be adversely affected."

*United States v. Texas*, 173 F.4th 659, 666 (5th Cir. 2026) (en banc) ("*Texas S.B. 4*"). Centro Legal tries to distinguish its expenditures from those at issue in *Texas S.B. 4* because it cannot shift its priorities as its obligations run to identified clients in identified proceedings and its attorneys will now have to do unfunded legal work they were not expecting. Mot. 13. Again, it is not clear that these costs are traceable to the district court's judgment given the change in Executive priorities. Nevertheless, Appellant's claims are squarely foreclosed by *Texas S.B. 4* because they relate to the increase or decrease of legal services for clients. *See* 173 F.4th at 666. And its arguments to the contrary illustrate this Court's concerns that "*if* Nonprofit Plaintiffs were to have standing, any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities' and manufacture Article III standing every time a new law or regulation goes into effect." *Id.*

**4.** Finally, Centro Legal does not have a cognizable interest in the judgment based on its decision to dismiss litigation over a prior rule from 2020. *See* Mot. 14. Centro Legal faults the district court for not addressing a drive-by assertion that the Organization reasonably relied on the Rule when it dismissed its "successful" challenge to a related rule issued in 2020. Mot. 14. But Appellants entirely fail to flesh out this argument such that the Department can even respond to it. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010). Instead, they cite one case

presenting an entirely different factual scenario. *See Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023) (finding a valid reliance interest where participants in a specific financial market were directly harmed by rescission of an agency's no-action letter). Appellants have therefore waived this reliance argument. Even so, Centro Legal's injury is self-inflicted because it made a discretionary litigation decision to seek dismissal and should have expected that the Rule might be vacated in the future when doing so.

For the foregoing reasons, Appellants have failed to establish that they are likely to succeed on appeal as to their claims to standing.

**B. Appellants' challenges to the district court's judgment are beside the point and in any event are meritless.**

Because the district court properly denied intervention for lack of standing, Appellants "are nonparties and cannot appeal the consent judgment," *United States v. Texas*, 181 F.4th 548, 561 (5th Cir. 2026), thus this Court lacks "appellate jurisdiction" to even consider the merits of Appellants' challenge to the consent judgment, *id.*; *see also Edwards v. City of Houston*, 78 F.3d 983, 993 (5th Cir. 1996) (dismissing part of the appeal that seeks review of the final judgment given the appellant was denied leave to intervene), and summary dismissal would be appropriate. Even if this Court disagrees and finds Appellants have standing, remand is the only proper remedy, not summary reversal, because the district court did not reach other intervention factors under Rule 24(a)(2), *see* Add.088–94, and this Court

should not do so in the first instance. And even if intervention is warranted, Appellees must have the opportunity to challenge Appellants' theories of standing, such as through discovery.

In any event, even assuming there is appellate jurisdiction to stay the consent judgment, a stay is improper because Appellants also fail to demonstrate likelihood of success on their arguments that the consent judgment is unlawful.

**1.** Appellants contend the district court lacked jurisdiction to enter the judgment in the first place because a consent judgment proves the suit was collusive. *See* Mot. 24. But mere agreement with an opponent's litigating position does not render a judicial remedy moot. The Supreme Court has squarely rejected that argument even after *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971). *See United States v. Windsor*, 570 U.S. 744, 758–59 (2013) (parties' agreement that the Defense of Marriage Act was unconstitutional did not deprive the district court or appellate courts of jurisdiction where, among other things, the United States continued to comply with the statute); *INS v. Chadha*, 462 U.S. 919, 939–40 (1983) (parties' agreement that a statute allowing one chamber of Congress to order the Executive to deport the respondent did not deprive courts of jurisdiction where the Executive would in fact deport the respondent).

The Department's prior statement that it would not in good faith defend the Rule against a legal challenge does not prove the suit collusive either. Although

EOIR noted it would not defend the Rule "in good faith against a legal challenge," it did not "mandat[e] a particular outcome in any specific case" or in any way limit an immigration judge's "independent judgment and discretion in adjudicating cases" or their "authority under application law," including when ruling on requests for administrative closure. *See* PM 25-29 at 8. Thus, at the time of suit, immigration judges within the Department continued to apply the Rule to motions to administratively close cases. Accordingly, the district court's decision had "real meaning," *see Chadha*, 469 U.S. at 939–40, and redressed an actual injury: if Texas obtained a favorable judgment, the Department would be barred from enforcing the Rule. Even the dissenters in *Windsor* did not doubt that the district court had jurisdiction notwithstanding the parties' agreement on the unconstitutionality of the Defense of Marriage Act. 570 U.S. at 781 (Scalia, J., dissenting) ("Windsor's injury was cured by the judgment in her favor."). The Department's continued application of the Rule—meaning it did not rescind the Rule or deprive immigration judges of authority to adjudicate motions under the Rule prior to the judgment—also clearly distinguishes this case from *Pool v. City of Houston*, 87 F.4th 733 (5th Cir. 2023), on which Appellants rely. *See id.* at 734 ("The City also agreed that it 'would and could not enforce the provisions.'"); Mot. 15.

**2.** Appellants' attempt to invalidate the judgment under the Administrative Procedure Act ("APA") also fails. They claim that the Department could only

rescind the rule after providing public notice and an opportunity to comment and could not agree to its vacatur by a court. Mot. 16–18. But the Department has not rescinded the Rule and agrees that it must pursue rulemaking to do so under the APA. However, in the meantime, the Department cannot be required to defend a rule it believes is unlawful, and it must follow any orders courts entered against it. Appellants further argue that the Department's decision to settle the case is reviewable and that the Department could not settle in a manner that violates the APA's rulemaking provisions. Mot. 17–18. Appellants cannot credibly claim that the government can never concede error and agree that vacatur of a rule is an appropriate remedy in a given case—this Court, en banc, has given effect to such confessions of error. *See, e.g.*, *Airlines for Am. v. Dep't of Transp.*, 166 F.4th 487, 488–89 (5th Cir. 2026) (en banc) (per curiam) (vacating a Department of Transportation ("DOT") rule where DOT "conceded that it violated the APA" in its rulemaking and "agree[d] to the remedy of vacatur").

**3.** Appellants' arguments on the merits of an immigration judge's statutory authority to administratively close cases (Mot. 19–22) fail. Appellants claim that administrative closure falls under the sort of docket management authority the INA delegates to the Attorney General and that the Homeland Security Act of 2002 ("HSA") carried forward this authority. Mot. 19–20. Not true. Although the INA gives the Attorney General and immigration judges broad responsibility to

adjudicate certain immigration cases and issue regulations and perform such other acts as are necessary for carrying out that function, *see generally* 8 U.S.C. §§ 1103(g)(2), 1229a, it also commands that immigration judges shall, "[a]t the conclusion of the proceeding[,]" "decide whether an alien is removable from the United States," *id.* § 1229a(c)(1)(A). It does not allow immigration judges to exercise discretion to decline to carry out this statutory mandate or to administratively close a case to avoid coming to such a conclusion. *See Matter of Quintero*, 18 I&N Dec. 348, 350 (BIA 1982) (noting that an immigration judge "may neither terminate nor indefinitely adjourn the proceedings in order to delay an alien's deportation"). And it certainly does not give immigration judges discretion to determine whether to pursue a case. That authority lies with DHS, and EOIR cannot use administrative closure to usurp DHS's role.

The HSA does not change this conclusion. *Contra* Mot. 19–20. The HSA abolished the former Immigration and Naturalization Service, moved its functions to the DHS, and clarified which functions remained with EOIR. *See, e.g.*, 8 U.S.C. § 1101 (as amended by the HSA, explaining which authorities are vested with each Department head); 8 U.S.C. § 1551 note. It did not purport to render lawful all of EOIR's practices that existed before. And the fact that EOIR adjudicators have administratively closed cases for decades does not mean such acts were lawful or that they are in accordance with the current version of the INA.

The fact that an order administratively closing a case does not substitute for a final removability determination (Mot. 21) is not a smoking gun, rather it is the problem. Indefinitely delaying adjudication of a case, as opposed to continuing a case for a finite period, is an abdication of the statutory role of an immigration judge. *Contra* Mot. 21–22. And although administrative closure has long been billed as "temporarily suspending a case," *see* Mot. 21, as discussed above, EOIR data shows administrative closure is anything but temporary, *see supra* n.1. Relatedly, Appellees and the district court were not wrong to rely on *Hernandez-Serrano v. Barr*'s discussion of whether "a general authority to close cases administratively can itself be lawful while leading to such facially unlawful results." 981 F.3d 459, 465 (6th Cir. 2020). *Contra* Mot. 20. Although the *Hernandez-Serrano* court considered the availability of administrative closure under then-existing regulations in an individual case, its analysis of administrative closure more broadly is relevant here.

## II. The other stay factors strongly favor the government.

The remaining *Nken* factors confirm a stay pending appeal is unwarranted. First, Appellants have not suffered irreparable harm warranting stay relief. Centro Legal warns of its increased workload—an estimated "40 to 200 additional hours of additional staff time" to assist aliens with removal proceedings. Mot. 13. But a legal-services organization cannot seek equitable relief "merely because a new law or regulation requires it to . . . adjust resources in response, or to increase the degree or

scope of legal representation for its current or prospective clients who may be adversely affected." *Texas S.B. 4*, 173 F.4th at 666; *see also Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) ("[G]roups have no legally-protected interest in not expending their resources on behalf of individuals for whom they are advocates."). And Centro Legal's increased workload, a foreseeable result of its own decision to pursue such activities, cannot support its claim to equitable relief. *See Texas S.B. 4*, 173 F.4th at 662 ("That should be the end of this matter: These Plaintiffs voluntarily incurred costs to advocate for clients.").

For their part, the Cities complain that the consent judgment "extinguishes" their "identifiable revenue streams" because "[e]ach worker who is ultimately removed is a specific taxpayer whose payments the Cities lose." Mot. 10. That supposed harm is not irreparable. *See State of Florida v. Mellon*, 273 U.S. 12, 18 (1927). It is also hyperbolic, abstract, and rests on speculation about a highly attenuated chain of contingencies, which precludes a finding of irreparable harm. *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022). "A principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona v. United States*, 567 U.S. 387, 396 (2012), and as the district court correctly recognized, "[w]hether an individual, tax-paying alien is ultimately deported

requires another branch of government to adjudicate removal and exercise discretion to enforce any resulting removal order," Add.093.

This Court should also reject the Cities' attempt to equate, on the one hand, tax dollars they may lose due to a self-inflicted reliance on illegal aliens as a taxpayer base, with, on the other hand, dollars a sovereign is forced to spend to remove illegal aliens in accordance with federal law. The former—frustrated reliance on a systematic disregard of federal immigration law—is not irreparable harm and cannot support an entitlement to equitable relief. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (discounting as "self-inflicted" a plaintiff State's supposed fiscal harm traceable to its own statutory funding mandate).

Finally, the balance of equities and public interest—which merge here—weigh decisively against a stay. The United States seeks to enforce our Nation's immigration laws, and "there is always a public interest in prompt execution of removal orders." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *Nken*, 556 U.S. at 436). There is no public interest in systematically preventing the execution of removal orders—which is what Appellants admit they seek to do. Mot. 9–14; *see also Aristy-Rosa v. Att'y Gen*., 2026 WL 2363039, at *4 (3d Cir. Aug. 14, 2026) ("A stay that results in an 'inability to enforce its duly enacted plans clearly inflicts irreparable harm' on the Executive Branch." (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018))). And the Cities' local law enforcement interest in

cooperating with recipients of U visas, Mot. 11–12, must give way to the Executive's judgment about the best use of the U visa program. *See, e.g.*, *Mellon*, 273 U.S. at 17 (when federal policy "interferes with the exercise of the state of its full powers, . . . that is a contingency which affords no ground for judicial relief").

Appellants' only other argument is that "[p]reserving the status quo 'is an important equitable consideration.'" Mot. 23. But if that argument were to carry the day, a stay would be granted in every case. For that reason, courts have recognized that "mere[] . . . preservation of the status quo" is not an interest sufficient on its own to warrant granting equitable relief. *United Food & Comm. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).

## CONCLUSION

For these reasons, this Court should deny Appellants' motion for a stay pending appeal.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

/s/ Anna L. Edwards
ANNA L. EDWARDS
Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue
Washington, D.C. 20530
Anna.Edwards@usdoj.gov

HENRIQUE CARNEIRO
Counsel to the Associate Attorney General

Dated: September 23, 2026

Counsel for Defendants–Appellees

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that the attached response complies with Federal Rule of Appellate Procedure 27(d)(1)(E) and (d)(2)(A) because it contains 4,838 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: September 23, 2026

/s/ Anna L. Edwards
ANNA L. EDWARDS
Counsel for Defendants–Appellees

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 23, 2026

/s/ Anna L. Edwards
ANNA L. EDWARDS
Counsel for Defendants–Appellees